487 A.2d 1240

Herbert SCHEAR, et al.

v.

MOTEL MANAGEMENT CORPORATION OF AMERICA, et al.

No. 673, Sept. Term, 1984.

Court of Special Appeals of Maryland.

Feb. 14, 1985.

672

**674**

676

L. Palmer Foret, Rockville (William J. Carter and Carr, Goodson & Lee, P.C., Rockville, on brief for appellant, Travelers Insurance Company, Kenneth J. Annis, Washington, D.C., on brief for appellants, Herbert and Blanche Schear), for appellants.

M. Michael Cramer, Rockville (Janet M. Nesse, Rockville, on brief for appellees, Norman Craig and Chevy Chase

Motel Associates, William H. Clarke, Rockville, for appellees, Holiday Inns, Inc. and Motel Management Corporation of America), for appellees.

Argued before MOYLAN, ADKINS and BLOOM, JJ.

BLOOM, Judge.

Herbert Schear, his wife, Blanche, and their insurer, Travelers Insurance Company (Travelers), appellants, filed a civil action in the Circuit Court for Montgomery County against the appellees, Motel Management Corporation of America, Chevy Chase Motel Associates, Norman Craig and Holiday Inns, Incorporated, asserting that jewelry, furs and clothing owned by the Schears had been stolen from their room at the Holiday Inn in Chevy Chase.

Holiday Inns, Incorporated (Holiday) had granted a franchise to Chevy Chase Motel Associates (Associates), the owner of the hotel in question. Associates, in turn, contracted with Motel Management Corporation of America (Management) to operate and manage the hotel; Norman Craig, the manager of the hotel, was employed by Management.

Judge William Miller, who presided at the trial, granted Holiday's motion for directed verdict at the end of the plaintiffs' case. He granted Craig's motion for directed verdict at the close of all the evidence. The jury returned a verdict in favor of Associates and Management.

Appellants contend:

1. The trial judge erred to the substantial prejudice of appellants when he refused to allow admission into evidence of computer print-outs generated by the Montgomery County Police, listing reported criminal activities at the Holiday Inn in Chevy Chase, Maryland.

2. The trial judge erred to the substantial prejudice of the appellants when he instructed the jury on the

doctrines of contributory negligence and assumption of risk.

3. The trial judge erred to the appellants' substantial prejudice when he refused to admit into evidence the Holiday Inn loss prevention manual and advertisements pertaining to Holiday Inns and whether he subsequently erred by granting motions for directed verdict on behalf of Holiday Inns, Inc., and Norman Craig.

4. The judge below erred to the appellants' substantial prejudice when he instructed the jury that the Maryland innkeepers' statute could apply in the instant case and when he refused to instruct the jury as to the effect of negligence of the hotel on the application of the innkeepers' statute.

5. The trial judge erred to the appellants' substantial prejudice when he ruled that notes made by a defense security expert need not be produced for use by the plaintiffs at trial.

6. The trial judge erred in not allowing counsel for Travelers to inquire of Detective Calarco if in the course of the police investigation following the burglary Mr. Evans was ever arrested by the police in connection with the theft of the Schears' property.

Rejecting each of these contentions, we affirm the judgment of the circuit court.

## Facts

In preparation of a visit to the Washington, D.C. area to celebrate their grandson's bar mitzvah, Mr. and Mrs. Schear, residents of Dayton, Ohio, reserved the entire twelfth floor of the Holiday Inn in Chevy Chase for early December 1979 for themselves and various other members of their family. The Schears, who traveled extensively, usually stayed at this hotel whenever they came to the Washington area to visit either of their grown daughters. They had previously rented the entire twelfth floor in 1977

for another grandson's bar mitzvah. Since that time, the Schears estimated that they had stayed at the Chevy Chase Holiday Inn ten or twelve times. They always requested the same room, room 1212.

When Mr. Schear called the hotel in 1979 to place his reservation, he spoke to Mr. Craig, the hotel manager. Craig had made the arrangements on the previous occasion when the Schears had reserved the entire twelfth floor, and Mr. Schear asked Craig if it would be possible to make the same arrangements for this visit. Mr. Schear testified that, after discussing the security measures available at the hotel with Craig, he decided to hire an additional security guard for December 7 and 8 to protect himself and his wife and their guests against break-ins. He had also employed a private security guard in 1977. On neither occasion, however, did he or his wife inform anyone at the hotel of the amount of valuables that they would be carrying with them.

The Schears arrived at the hotel in the early afternoon of December 5, 1979. Mr. Schear testified that he and his wife were carrying an "extraordinary" amount of jewelry [1] with them, in addition to furs and clothing that they intended to wear during their stay. Mr. Schear asserted that he had previously telephoned a Washington area jeweler named Brett Evans about the possibility of selling some jewelry and that he and his wife had brought the jewelry to Washington in the hope that Evans would have located some purchasers for it. Mr. Schear telephoned Evans upon arriving at the hotel and left a message that he had arrived with "the items." That message also included the Schears' hotel address, room number and phone number. When Mr. and Mrs. Schear left the hotel later that afternoon, with their jewelry in their luggage in their room, Mr. Schear locked the hotel room door and placed his keys on the front counter for the desk employee, as he customarily did when

---

1. Mr. Schear claimed the stolen jewelry was worth more than a quarter of a million dollars. The loss sheet prepared by Travelers placed the value at $200,000.

staying at that hotel. The Schears had not hired a private security guard for December 5; the hotel security procedures called for twenty-four hour surveillance by a single guard. Upon returning to their hotel room that evening, the Schears discovered that their jewelry, Mr. Schear's fur coat, three pieces of luggage, and a number of suits belonging to Mr. Schear had been stolen.

## I. *Admissibility of Computer Print-Outs*

Appellants assert initially that the trial court erred in refusing to admit into evidence certain computer print-outs. These print-outs, which were compiled by the Montgomery County Police Department, listed crimes that had been reported to and investigated by the police as having occurred at or in the vicinity of the Chevy Chase Holiday Inn. Appellants argue that the print-outs were relevant to establish that the hotel and its management had knowledge of a high incidence of reported crime at the hotel but failed to take reasonable steps in prevention thereof. Although they concede that the print-outs constitute hearsay, in that they were offered to prove the truth of the matter asserted therein, appellants argue that they are admissible under the written business record exception and the public records exception to the hearsay rule.

The business record exception is contained in Md. Cts. & Jud.Proc.Code Ann. § 10–101(b), which provides that "[a] writing or record made in the regular course of business as a memorandum or record of an act, transaction, occurrence, or event is admissible to prove the act, transaction, occurrence or event." Appellants correctly observe that police accident reports are admissible under this exception, *Levine v. Beebe*, 238 Md. 365, 209 A.2d 67 (1965), and that summaries or compilations of business records may similarly be admissible, *Smith v. Jones*, 236 Md. 305, 203 A.2d 865 (1964).

The print-outs that appellants sought to introduce, however, are not accident reports; they are merely lists of unverified complaints of crimes made by unidentified indi-

viduals. The attempt to characterize the print-outs as admissible police reports is based upon the fact that the only crime reports included in the compilation are those in which a police officer investigated the complaint. It is clearly established, however, that police investigative reports are admissible under the business records exception only to the extent that information contained therein is within the personal observation of the investigating officer and that any information based upon hearsay is inadmissible. *Holloway v. Eich,* 255 Md. 591, 258 A.2d 585 (1969); *Kuhl v. Aetna Casualty & Surety Co.,* 51 Md.App. 476, 443 A.2d 996 (1982); *Honick v. Walden,* 10 Md.App. 714, 272 A.2d 406 (1971). As the trial judge noted, since the reported crimes contained in these print-outs were not based upon the personal observations of the investigating officer, they constitute hearsay that is inadmissible under the business records exception.

The print-outs are also inadmissible under the public records exception for a similar reason. Md.Cts. & Jud. Proc.Code Ann. § 10–204 states that

[a] copy of a public record, book, paper, or proceeding of any agency of any state or of any of its political subdivisions or of an agency of any political subdivisions shall be received in evidence in any court if certified as a true copy by the custodian of the record, book, paper, or proceeding, *and if otherwise admissible.*

(emphasis added).

In order to fall within this exception, a writing must not only be a public record but must be "otherwise admissible" under the hearsay rule. It is unnecessary for us to determine whether these print-outs would qualify as public records; being based on hearsay, they were inadmissible in any event.

There is a further basis for excluding these computer print-outs. As Judge Miller correctly observed when appellants asserted that the print-outs were necessary to prove the innkeeper's knowledge of the high incidence of

crime occurring on the hotel's premises, the print-outs did not reflect the number of crimes that actually occurred. Evidence, to be admissible, must be relevant and a determination as to relevance is left to the discretion of the trial judge. *See Haile v. Dennis*, 184 Md. 144, 152, 40 A.2d 363 (1944). The "rational probative value" of these print-outs in establishing the hotel's negligence was questionable, particularly when there was no way of establishing how many of the "reported" offenses actually occurred. Moreover, the print-outs made no distinction between crimes reported to have occurred in the hotel's underground parking lot and those reported to have taken place inside the hotel itself.

Since the computer print-outs were excludable not only because they constituted hearsay but also because they were irrelevant, Judge Miller did not err in refusing to admit them.

## II. *Jury Instructions Concerning Contributory Negligence and Assumption of Risk*

Appellants next contend that there was insufficient evidence to permit the judge to instruct the jury on the affirmative defenses of either contributory negligence or assumption of risk.

In asserting the defense of contributory negligence, the defendant has the burden of proving that a reasonably prudent person would have taken certain precautions under the circumstances and that the plaintiff's failure to take such precautions was a proximate cause of the injury. *Abraham v. Moler*, 253 Md. 215, 252 A.2d 68 (1969); *Ensor v. Ortman*, 243 Md. 81, 220 A.2d 82 (1966). Assumption of risk has been defined as involving the voluntary and unreasonable exposure to a danger of which the plaintiff knew or had reason to know. *Powers v. State*, 178 Md. 23, 11 A.2d 909 (1940). Maryland courts have recognized that it is often difficult to distinguish between the two defenses, since both assumption of risk and contributory negligence may arise from the same set of facts. *Schleisner Co. v. Birchett*, 202 Md. 360, 96 A.2d 494 (1953); *Reaver v. Barl-*

*ly,* 28 Md.App. 614, 346 A.2d 697 (1975). A distinction is often times made on the basis that while assumption of risk implies an intentional exposure to a known danger this may or may not be true of contributory negligence. *Reaver v. Barlly, supra,* at 621, 346 A.2d 697.

A determination of the applicability of either theory is a matter to be resolved by the jury. *See Munzert v. American Stores Co.,* 232 Md. 97, 105, 192 A.2d 59 (1963). Appellants argue that nothing less than a failure by Mr. and Mrs. Schear to lock their hotel room would suffice to warrant submitting instructions on contributory negligence or assumption of risk to the jury. We disagree. By their own testimony, the Schears admitted that on the ten or twelve occasions that they had stayed at that particular hotel they had never bothered to use the safety deposit boxes provided by the management, although they were aware of their existence. Mr. Schear testified that he and his wife "discussed on the plane whether we were going to use the safe deposit box or take a gamble." The Schears were seasoned travelers, yet Mrs. Schear stated that in all their travels she had never used a hotel safe. When Mr. Schear placed his reservation with Craig, he made no request for an additional security guard for December 5, 1979. No mention of the large quantity of valuables carried by the Schears was ever made to Craig or anyone on the hotel staff.

Having made a conscious decision not to use the safe deposit box that the hotel provided, Mr. Schear placed a telephone call to a jeweler or gemologist he had never met and left a message on his answering service that included his name, his hotel, his room number, and the fact that he had "the items" with him. Even he acknowledged, in a pre-trial deposition, that a reasonably prudent man would not have done that. Furthermore, when he left the hotel on the afternoon of the theft, Mr. Schear threw his room key on the room clerk's counter without taking the precaution of leaving it with any particular individual. The jury could

have reasonably concluded that such conduct amounted to negligence that contributed to appellants' loss.

### III. *Evidentiary Rulings and Directed Verdict*

Appellants assert that the trial judge erred in refusing to admit certain portions of a loss prevention manual, a standards manual that was distributed by Holiday Inns, Inc., to their franchisees, and a number of Holiday Inn advertisements. As stated earlier, any decision to exclude evidence on the ground that it lacks relevance is left to the sound discretion of the trial judge, and it will not be reversed unless it amounts to a clear abuse of discretion.

The portion of the loss prevention manual that Judge Miller refused to admit into evidence was the VIP section, which concerns government officials, dignitaries, and celebrities. Despite the opinion seemingly held by the Schears as to their own importance, mere affluence did not qualify them for VIP status.

 The entire construction standards manual was excluded as irrelevant because it was not in effect at the time this particular Holiday Inn was built. We find no error in that ruling, since it would be manifestly unreasonable to hold an innkeeper to a construction standard adopted by the franchiser after his hotel was built. Similarly, we find no error in the exclusion of the advertisements because there was no suggestion that the Schears relied upon them in deciding to stay at the Chevy Chase Holiday Inn; rather, they themselves acknowledged that their decision was based on the proximity of the hotel to both of their daughters' homes.

In conjunction with this evidentiary issue, appellants contest the propriety of the granting of a directed verdict as to Norman Craig and Holiday.

In their complaint the appellants asserted counts of negligence and negligent misrepresentation against the defendants. In their count for negligent misrepresentation, they alleged that Craig had shown Mr. Schear what he represent-

ed as being a "nerve center" from which hotel security was monitored. This incident was denied by Craig.

█ A motion for directed verdict requires the trial judge to determine whether there is sufficient evidence to present a question to the jury. *Holloway v. Wright,* 21 Md.App. 615, 320 A.2d 572 (1974); *Moran v. Williams,* 19 Md.App. 546, 313 A.2d 527 (1974). The evidence and all inferences reasonably deducible therefrom must be viewed in the light most favorable to the plaintiff, *Rafferty v. Weimer,* 36 Md.App. 98, 373 A.2d 64 (1977), and the case must be submitted to the jury if there is any evidence legally sufficient as tending to prove negligence. *Beahm v. Shortall,* 279 Md. 321, 368 A.2d 1005 (1977); *Keene v. Arlan's Department Store of Baltimore, Inc.,* 35 Md.App. 250, 370 A.2d 124 (1977).

█ In ruling upon Craig's motion, Judge Miller noted that Mr. Schear never claimed that the nerve center was not there. On the contrary, Schear stated that Craig showed the center to him. As the judge observed, since Mr. Schear saw the facility, a representation that the hotel had a "nerve center" could not have been false. Furthermore, justifiable reliance is a required element of negligent misrepresentation, and there was no indication that the Schears relied on the alleged nerve center in deciding to stay at the hotel. There being no evidence to the effect either that Craig had negligently misrepresented any fact about the hotel's security procedures to the Schears or that the Schears relied upon any representation concerning security at the hotel, it was proper to direct a verdict on the issue of negligent misrepresentation.

█ The granting of a directed verdict for Craig on the negligence count was also proper. This court has previously held that a hypothesis of negligence based on surmise and conjecture is not sufficient to warrant submitting the case to a jury. *Keene v. Arlan's Department Store of Baltimore, Inc., supra.* Nowhere does the record indicate that Craig deviated from his duties as hotel manager with

regard to maintenance of the hotel's security. In fact, Craig was not even present on the date in question. Mr. Schear requested Craig to provide the same security that was provided for them when they visited the hotel in 1977, and there was no evidence that Craig failed to do so. It was the policy of the hotel to have one security guard on duty twenty-four hours a day, and there was no indication that a guard was not on duty on the date the Schears' property was stolen.

Appellants refer to Craig's failure to comport with the security procedures suggested by the Holiday Inns, Inc., loss prevention manual. The procedures suggested by this manual were suggestive only, and the manual itself advised the management of each individual hotel to adopt whatever security precautions it deemed to be appropriate.

Notice of the security procedures provided by the Chevy Chase Holiday Inn was provided in the "law card" posted on the inside of every hotel room door. That the Schears failed to avail themselves of such procedures is in no way imputable to Craig.

The granting of a directed verdict in favor of Holiday was also proper. Appellants sought to hold Holiday, as franchiser, liable for the conduct of Associates, as franchisee, under a theory of agency.[2]

Agency has been defined as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act." *Restatement (Second) of Agency* § 1(1) (1958). Under the licensing agreement that granted a franchise to Associates, Holi-

---

2. The distinction between a principal-agent relationship and a master-servant relationship was explained in *Medical Mutual Liability Insurance Society v. Mutual Fire, Marine and Inland Insurance Co.,* 37 Md.App. 706, 713–14, 379 A.2d 739 (1977), as being "that an agent is employed to represent the principal in regard to contractual obligations with a third person; a servant is employed to render a service to, rather than for, the master, although it may occur that the service will involve relations with third persons."

day sold to Associates the "Holiday Inn System," which is a "standardized, uniform inn service, identified with the words 'Holiday Inn' and with the other distinguishing features, trade marks, and service marks of the System." In exchange for the use of this system of inn management and the Holiday Inn name, Associates paid Holiday a fee of $10,000 and a set monthly payment computed according to the number of hotel rooms being used by the franchisee. The licensing agreement further specified that "the parties hereto are not ... agents of the other in any sense" and that "neither has power to obligate or bind the other."

Despite this contractual disavowel of an express agency, appellants alleged that an agency relationship should either be inferred from the parties' conduct or else should be found to exist under the theory of apparent authority or agency by estoppel. When an agency relationship depends upon the conduct of the parties, the person alleging the agency has the burden of proving not only its existence but its nature and extent. *Medical Mutual Liability Insurance Society v. Mutual Fire, Marine and Inland Insurance Co., supra,* at 713, 379 A.2d 739.

We agree with Judge Miller that the Schears and Travelers failed to produce any evidence from which a reasonable inference could be drawn that these parties had entered into an agency relationship. There are three elements that are integral to an agency relationship: (1) The agent is subject to the principal's right of control; (2) the agent has a duty to act primarily for the benefit of the principal; and (3) the agent holds a power to alter the legal relations of the principal. *Restatement (Second) of Agency* §§ 12–14 (1958). In noting that the control element is instrumental in proving the existence of an agency relationship, the *Restatement* explains that "[i]t is the element of continuous subjection to the will of the principal which distinguishes the ... agency agreement from other agreements." *Restatement (Second) of Agency* § 1(1) comment b (1957); *see B.P. Oil Corp. v. Mabe,* 279 Md. 632, 370 A.2d

554 (1977). The control element was totally lacking in this case. The management and operation of the Chevy Chase Holiday Inn were vested entirely in Associates, which in turn contracted with Management, Craig's employer, to manage the running of the hotel. Although Holiday retained the right to conduct periodic inspections as a means of insuring adherence to Holiday Inn standards, it took no part in the day-to-day operation of the hotel. Associates merely purchased a product from Holiday—a uniform system of inn service—that carried with it an obligation to maintain certain standards prescribed by the seller. But "the fact that one of the parties has subsidiary duties to act for the interests of another, as where a purchaser of goods from a manufacturer agrees that he will advance the interests of the manufacturer in certain respects, does not create an agency relation with respect to the sale." *Restatement (Second) of Agency* § 13 comment c (1958). The right possessed by Holiday to insure compliance with its franchise standards constitutes no more than the right to enforce such a subsidiary duty.

To prove agency by apparent authority or agency by estoppel, the Schears had to show that they relied on the name of Holiday Inns, Inc., in choosing to stay at this hotel. *See Medical Mutual Liability Insurance Society v. Mutual Fire, Marine and Inland Insurance Co., supra.* This they failed to do. As noted earlier, there was no evidence that the Schears based their decision to stay at the Chevy Chase Hotel on anything other than the proximity of the hotel to their daughters' homes.

### IV. *Instruction on the Innkeepers' Statute*

At the close of the evidence, Judge Miller included among his instructions to the jury an explanation of the "innkeepers' statute," Md.Ann.Code art. 71, § 3. This statute, abrogating the common law rule that an innkeeper was, in effect, an insurer of his guests' baggage, provides in subsection 3(a):

If any iron safe or other secure depository for the keeping of the money, jewelry, securities and plate belonging to guests is provided, then, unless such money, jewelry, securities and plate are deposited with such hotel or inn, or its agent, the hotel or inn shall not be responsible for the loss of such money, jewelry, securities and plate, or any part thereof, by robbery or otherwise, unless such loss occurred from collusion or negligence on the part of such hotel or inn or its agent; in the event that such money, jewelry, securities and plate are deposited with such hotel or inn, the liability of the hotel or inn for the loss of such money, jewelry, securities and plate shall not exceed the sum of $300, unless at the time of such deposit the money, jewelry, securities and plate so deposited shall be exhibited to the representative of the hotel or inn and the value thereof declared by the depositor to such representative. In no event shall any hotel or inn be under any obligation to accept for safekeeping any money, jewelry, securities and plate having a declared value in excess of $1,000, nor shall any hotel or inn be liable in excess of $1,000, for loss of or damage to any such property, whether or not tendered to it for safekeeping and whether or not accepted by it for safekeeping.

Subsection 3(e) requires that a printed notice of the statute's provisions be displayed in each guest room of a hotel or inn as a condition of the innkeeper's limitation of liability.[3] Subsection 3(d) limits the liability of an innkeeper for the loss of a guest's "proper baggage"—that is, items other than money, jewelry, securities and plate—to $300.[4]

---

**3.** Md.Ann.Code art. 71, § 3(e) states that

[t]he foregoing provisions, other than those contained in subdivision (b) of this section limiting the liability of hotels and inns with respect to the loss of property shall be applicable to those hotels or inns only which cause a printed notice of such provisions to be displayed in each guest room (as distinguished from public rooms) of the hotel or inn.

**4.** Section 3(d) provides that

Thus, if an innkeeper provides a safe deposit box or safe in which to keep his guests' valuables and posts a notice of the innkeepers' statute in the hotel room, he is not liable for the loss of any such valuables not tendered to the innkeeper for safekeeping. Where the loss results from collusion or negligence on the part of the innkeeper, however, the limitation of liability is inapplicable.

◼ Appellants contend that the trial judge erred by instructing the jury on the innkeepers' statute because appellants' claims were based on allegations of negligence and the statutory limitation of liability is inapplicable where the innkeeper is negligent. In order to warrant an instruction on the innkeepers' statute, the appellees had to produce sufficient evidence that the hotel provided either a safe or safety deposit box and notice thereof in the Schears' hotel room. Ample evidence of both statutory prerequisites was provided. That the hotel provided safe deposit boxes was uncontroverted. The head housekeeper at the hotel and the maid who had attended to the Schears' hotel room testified to the strict procedures that were followed by the hotel concerning placement of the so-called "law cards" in each hotel room. In addition, the maid testified that she saw such a card in the Schears' room immediately following the theft. This testimony was sufficient to warrant the trial judge's instructing the jury on the innkeepers' statute. The Schears denied that there was a card posted in their room, but they also acknowledged that they never bothered to read the signs posted in their hotel rooms. The propriety of the instruction would be unaffected by a finding of negligence on the part of the appellees/defendants. A finding that the innkeeper was negligent does not render the provision inapplicable; it merely triggers the exception to the innkeeper's limitation of liability. Furthermore, the fact

---

[w]ith respect to the loss of property (other than money, jewelry, securities and plate for which provision is made in paragraph (a) hereof) of registered guests from their rooms in any hotel or inn, the hotel or inn shall not be liable in excess of the sum of $300.00. *Id.* at § 3(d).

that the hotel management had notified the Schears that it had provided a safe depository for their valuables and by so doing had greatly limited its liability in the event of loss was a factor to be considered by the jury on the issue of contributory negligence.

■ After reading the applicable provisions of the innkeepers' statute to the jury, the judge summarized the law as follows:

> In accordance with this law if you find by a preponderance of the evidence, number one, if any iron safe or other secure depository for the keeping of money, jewelry, securities and plate belonging to guests was on December 5, 1979, provided for such guests by the hotel, and if you further find that the hotel posted the notice of limitation of liability on the door of room 1212 and it was displayed thereon on December 5, 1979, then the hotel's liability for loss from this room is $300 and your verdict may not exceed this amount.

We agree with appellants that this portion of the instruction was a misstatement, since the $300 statutory limitation of liability applies only in the absence of collusion or negligence on the part of the innkeeper.

That error or slip of the tongue, however, does not warrant a reversal of the judgment for the appellees/defendants. In light of the fact that the jury found *no* liability on the part of the innkeeper, any error in the instructions with respect to the amount of damages that could be awarded was clearly harmless error.

■ Nor was there any error in the trial judge's instruction on the definition of a guest's "proper baggage." In explaining to the jury that in the absence of negligence the innkeeper's liability would be limited to the "proper baggage" of a traveler, the judge stated that "proper baggage only embraces merchandise and valuables designated for use or personal convenience on [a] journey." This description comports with that delineated by the Court of Appeals, *Roueche v. Hotel Braddock, Inc.,* 164 Md. 620, 165 A. 891

(1933), and appellants' attempts to include within that definition a quantity of valuable jewelry they intended to sell strains any reasonable sense of credulity.

## V. *The Security Expert's Notes*

Appellees informed appellants before trial that they intended to call Jack B. Hill as an expert witness in the field of hotel security. When they took Mr. Hill's deposition shortly before trial, appellants' counsel requested him to produce and disclose certain notes he had made. That request was refused. At the outset of the trial, appellants filed a motion to compel production of the notes, the motion being resisted on the ground that the notes constituted attorney's work product since they were made in anticipation of trial by an expert engaged to assist counsel in preparing for trial. Judge Miller examined the notes and then ruled that they were not discoverable material, not only because they constituted a work product but also because it was questionable whether the notes constituted discoverable documents in any event. He further ruled, however, that if Mr. Hill used the notes in connection with his testimony appellants' counsel would be given access to them for purposes of cross-examination. Appellants claim that it was error to deny them access to Mr. Hill's notes.

The difficulty with appellants' contention is that they have failed to preserve it for appellate review. The fact that Mr. Hill testified is apparent from the printed record extract, but the substance of his testimony was not included. The notes themselves were not marked for identification or made part of the record. Although reports or statements of findings and opinions of experts may be discoverable even if acquired or developed in anticipation of litigation or for trial, mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation are protectable from discovery as "work product." Md.Rules 2–402(c) and (e). Without the documents we simply cannot tell into which category they fall. Accordingly, we are totally unable to

determine whether the trial judge abused his discretion in ruling on appellants' discovery motion.

### VI. *Other Crimes Evidence*

Finally, appellants cite as error the trial judge's refusal to permit inquiry by the appellants into whether Evans, the jeweler Mr. Schears telephoned upon arriving at the hotel, was ever arrested in connection with the subsequent theft. In his closing argument, appellees' counsel commented:

> See, if you leave a message, and I really think that is the problem, if you leave a message somewhere that you have got $300,000 you are going to attract who? You are not going to attract some kid who is going to just say, "Oh, I am going to just bump into this doorway." You are going to attract—and I do not know this happened, by the way. All we know is that [Brett] Evans is called. Let's make it clear, I do not know that [Brett] Evans had anything to do with it. I was not there. But look at some of the likelihoods. You are likely to attract a professional.

Appellants contend that these and other references to Evans were made in an effort to implicate Evans in the theft of the Schears' valuables, and therefore appellants' inquiry was necessary to rebut this inference.

 The rule is clear that evidence of other crimes is only admissible against a witness in limited instances for purposes of impeachment. *Peaper v. State,* 14 Md.App. 201, 286 A.2d 176 (1972), *cert. denied,* 409 U.S. 987, 93 S.Ct. 342, 34 L.Ed.2d 253 (1973); *Berlin v. State,* 12 Md.App. 48, 277 A.2d 468 (1971). Evans was neither a witness nor a party, rendering evidence relating to his arrest inadmissible for any purpose. The circumstances surrounding Mr. Schear's telephone call to Evans were relevant to appellees' defenses of contributory negligence and assumption of risk, and the remarks made by appellees' counsel in reference thereto do not rise to the stature of criminal innuendo.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.